UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

ADOBE LUMBER, INC., a California
corporation,

        Plaintiff,

    v.

F. WARREN HELLMAN and WELLS FARGO
BANK, N.A., as Trustees of Trust A
created by the Estate of Marco
Hellman; F. WARREN HELLMAN as
Trustee of Trust B created by the
Estate of Marco Hellman; THE ESTATE
OF MARCO HELLMAN, DECEASED;
WOODLAND SHOPPING CENTER, a limited
partnership; JOSEPH MONTALVO, an
individual; HAROLD TAECKER, an
individual; GERALDINE TAECKER, an
individual; HOYT CORPORATION, a
Massachusetts corporation; PPG
INDUSTRIES, INC., a Pennsylvania
corporation; OCCIDENTAL CHEMICAL
CORPORATION, a New York
corporation; CITY OF WOODLAND; and
ECHCO SALES & EQUIPMENT CO.,

        Defendants,
_____/

AND RELATED COUNTERCLAIMS,
CROSSCLAIMS, AND THIRD-PARTY
COMPLAINTS.
_____/

NO. CIV. 05-1510 WBS EFB

MEMORANDUM AND ORDER RE:
MOTION FOR PARTIAL
SUMMARY JUDGMENT

----oo0oo----

1

1    Plaintiff Adobe Lumber Inc. brought this action against
2  several defendants for cost recovery, declaratory relief,
3  contribution, indemnity, nuisance, and trespass pursuant to the
4  Comprehensive Environmental Response, Compensation, and Liability
5  Act ("CERCLA"), 42 U.S.C. §§ 9601-9675; the Hazardous Substance
6  Account Act ("HSAA"), Cal. Health & Safety Code §§ 25300-25395;
7  and California common law.  Defendant City of Woodland ("City")
8  now moves for partial summary judgment on plaintiff's CERCLA and
9  HSAA claims pursuant to Rule 56 of the Federal Rules of Civil
10  Procedure.

11  I.   Factual and Procedural Background

12    In 1998, plaintiff purchased four parcels of land in
13  Woodland, California, and on one of these parcels sits a
14  commercial building and parking lot known as the Woodland
15  Shopping Center.  (See Riemann Decl. (Docket No. 356) ¶¶ 2-3.)
16  Between 1974 and 2001, Suite K of the Woodland Shopping Center
17  housed a dry cleaning business called "Sunshine Cleaners," which
18  was operated by defendants Harold and Geraldine Taecker.
19  (Pearlman Decl. Ex. H ("Taeckers' Resp. Req. Admis.") No. 2.)

20    Suite K of the Woodland Shopping Center is bordered on
21  the west by a public alley called Academy Lane, beneath which
22  runs a sewer owned by the City.  (Pearlman Decl. Ex. G ("City's
23  Resp. Req. Admis.") No. 3.)  A floor drain in Suite K connects to
24  the sewer through a lateral pipe.  (Pearlman Decl. Ex. P at 8.)
25  From 1974 until approximately 1991, the Taeckers used the floor
26  drain to dispose of wastewater containing the dry cleaning
27  solvent perchloroethylene ("PCE"), a volatile organic chemical
28  that is considered a "hazardous substance" under CERCLA.

2

1  (Pearlman Decl. Ex. M ("Taeckers' Supp. Resp. Req. Admis.") No.

2  6); see 40 C.F.R. § 302.4.

3          As alleged in the Third Amended Complaint ("TAC"),

4  plaintiff retained an environmental consultant in August 2001 to

5  conduct a limited subsurface investigation in the area around

6  Suite K and determine whether the Taeckers' activities had

7  affected the soil or groundwater.  (TAC ¶ 34.)  This

8  investigation revealed the presence of volatile organic

9  compounds, including PCE.  (Id.)  According to plaintiff, this

10  subsurface contamination resulted from the leakage of PCE from

11  the sewer beneath Academy Lane.  (Id. ¶ 33.)  Plaintiff contends

12  that the sewer was "especially likely to leak due to . . . its

13  age, the large number of joints, grout (mortared) joints, and

14  defects in the sewer system" and that the City's "management and

15  maintenance of the sewer system was re-active, minimal[,] and

16  inadequate."  (Pl.'s Stmt. Disputed Facts Nos. 31-33.)

17          After several communications with the Taeckers and the

18  California Regional Water Quality Control Board ("RWQCB"),

19  plaintiff brought a lawsuit against the Taeckers in January 2002,

20  and several other parties were later joined as third-party

21  defendants.  (See TAC ¶ 37.)  That action was subsequently

22  dismissed without prejudice when plaintiffs initiated the instant

23  lawsuit on July 27, 2005.  See Adobe Lumber, Inc. v. Hellman, 415

24  F. Supp. 2d 1070, 1073 (E.D. Cal. 2006).

25          The defendants in this action include the City, the

26  Taeckers, former owners of the Woodland Shopping Center, and the

27  manufacturers and distributors of the dry cleaning solvent and

28  equipment used at Suite K.  (See TAC ¶¶ 3-18.)  With respect to

3

1   the City, plaintiff alleges claims of declaratory relief and cost

2   recovery under CERCLA; declaratory relief, contribution, and

3   indemnity under the HSAA; and nuisance and trespass under

4   California common law.  (Id. ¶¶ 53-106.)  On October 2, 2008, the

5   court granted the City's motion to dismiss plaintiff's trespass

6   claim.  (See Docket No. 186.)  The City now moves for partial

7   summary judgment on plaintiff's CERCLA and HSAA claims pursuant

8   to Federal Rule of Civil Procedure 56.

9   II.  Discussion

10          Summary judgment is proper "if the pleadings, the

11  discovery and disclosure materials on file, and any affidavits

12  show that there is no genuine issue as to any material fact and

13  that the movant is entitled to judgment as a matter of law."

14  Fed. R. Civ. P. 56(c).  A material fact is one that could affect

15  the outcome of the suit, and a genuine issue is one that could

16  permit a reasonable jury to enter a verdict in the nonmoving

17  party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

18  248 (1986).  The moving party bears the burden of demonstrating

19  the absence of a genuine issue of material fact.  Id. at 256.  On

20  issues for which the ultimate burden of persuasion at trial lies

21  with the nonmoving party, the moving party bears the initial

22  burden of establishing the absence of a genuine issue of material

23  fact and can satisfy this burden by presenting evidence that

24  negates an essential element of the nonmoving party's case or by

25  demonstrating that the nonmoving party cannot produce evidence to

26  support an essential element of its claim or defense.  Nissan

27  Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099,

28  1102 (9th Cir. 2000).

1    Once the moving party carries its initial burden, the

2  nonmoving party "may not rely merely on allegations or denials in

3  its own pleading," but must go beyond the pleadings and, "by

4  affidavits or as otherwise provided in [Rule 56,] set out

5  specific facts showing a genuine issue for trial."  Fed. R. Civ.

6  P. 56(e); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324

7  (1986); Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir.

8  1989).  On those issues for which it will bear the ultimate

9  burden of persuasion at trial, the nonmoving party "must produce

10 evidence to support its claim or defense."  Nissan Fire, 210 F.3d

11 at 1103.

12    In its inquiry, the court must view any inferences

13 drawn from the underlying facts in the light most favorable to

14 the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith

15 Radio Corp., 475 U.S. 574, 587 (1986).  The court also may not

16 engage in credibility determinations or weigh the evidence, for

17 these are jury functions.  Anderson, 477 U.S. at 255.

18    A.   CERCLA and the HSAA

19    CERCLA was enacted in 1980 as a broad remedial measure

20 aimed at assuring "the prompt and effective cleanup of waste

21 disposal sites" and ensuring that "parties responsible for

22 hazardous substances bore the cost of remedying the conditions

23 they created."  Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d

24 1454, 1455 (9th Cir. 1986); see S. Rep. No. 96-848, at 13 (1980).

25 The statute "generally imposes strict liability on owners and

26 operators of facilities at which hazardous substances were

27 disposed," 3550 Stevens Creek Assocs. v. Barclays Bank of Cal.,

28 915 F.2d 1355, 1357 (9th Cir. 1990), and where the environmental

harm is indivisible, liability is joint and several, <u>B.F.</u>
<u>Goodrich Co. v. Murtha</u>, 958 F.2d 1192, 1198 (2d Cir. 1992)
(citing <u>O'Neil v. Picillo</u>, 883 F.2d 176, 178-79 (1st Cir. 1989)).

To further its purposes, CERCLA "'authorizes private
parties to institute civil actions to recover the costs involved
in the cleanup of hazardous wastes from those responsible for
their creation.'"   <u>Carson Harbor Vill., Ltd. v. Unocal Corp.</u>, 270
F.3d 863, 870 (9th Cir. 2001) (en banc) (quoting <u>3550 Stevens</u>,
915 F.2d at 1357).   To establish a prima facie case in a private
cost recovery action under CERCLA, a plaintiff must demonstrate
that

> (1) the site on which the hazardous substances are
> contained is a "facility" under CERCLA's definition of
> that term, . . . (2) a "release" or "threatened release"
> of any "hazardous substance" from the facility has
> occurred, . . . (3) such "release" or "threatened
> release" has caused the plaintiff to incur response costs
> that were "necessary" and "consistent with the national
> contingency plan," . . . and (4) the defendant is within
> one of four classes of persons subject to the liability
> provisions of [42 U.S.C. § 9607(a)].

<u>Id.</u> at 870-71 (quoting <u>3550 Stevens</u>, 915 F.2d at 1358).

Even if a plaintiff establishes a prima facie case,
however, a defendant can avoid liability through one of the
affirmative defenses provided in 42 U.S.C. § 9607(b).   These
defenses refer to situations in which the release of hazardous
substances "was caused solely by an act of God, an act of war, or
certain acts or omissions of third parties other than those with
whom a defendant has a contractual relationship."   <u>Murtha</u>, 958
F.2d at 1198 (citing 42 U.S.C. § 9607(b)).   The latter is
variously referred to as the "innocent landowner," "third-party,"
or "innocent-party" defense.   <u>See</u> <u>Carson Harbor</u>, 270 F.3d at 871;

6

1  United States v. Honeywell Int'l, Inc., 542 F. Supp. 2d 1188,

2  1199 (E.D. Cal. 2008) (England, J.).

3          Here, the City contends that plaintiff cannot satisfy

4  either the first or fourth elements of its prima facie case.

5  Specifically, the City argues that the sewer beneath Academy Lane

6  is not a "facility" under CERCLA and that the City is not "within

7  one of four classes of persons" subject to CERCLA liability.  The

8  City alternatively asserts that it is absolved from liability

9  pursuant to CERCLA's innocent-party defense.

10          Similar to CERCLA, California's HSAA provides for civil

11  actions for indemnity and contribution and expressly incorporates

12  CERCLA's liability standards and defenses.  See Castaic Lake

13  Water Agency v. Whittaker Corp., 272 F. Supp. 2d 1053, 1084 (C.D.

14  Cal. 2003) ("HSAA 'create[s] a scheme that is identical to CERCLA

15  with respect to who is liable.'" (quoting City of Emeryville v.

16  Elementis Pigments, Inc., No. 99-3719, 2001 WL 964230, at *11

17  (N.D. Cal. Mar. 6, 2001)) (alteration in original)); Goe Eng'g

18  Co., Inc. v. Physicians Formula Cosmetics, Inc., No. 94-3576,

19  1997 WL 889278, at *23 (C.D. Cal. June 4, 1997) ("California's

20  [HSAA] imposes essentially the same standards of liability as

21  CERCLA.").

22          Under the HSAA, the term "site" has the same meaning as

23  "facility" defined in 42 U.S.C. § 9601(9); the terms "responsible

24  party" or "liable person" refer to the four classes of persons

25  defined in 42 U.S.C. § 9607(a); and the "defenses available to a

26  responsible party or liable person" are those defenses specified

27  in 42 U.S.C. § 9607(b), which include the innocent-party defense.

28  Cal. Health & Safety Code §§ 25323.9, 25323.5.  Thus, as the

parties acknowledge, the City's arguments as to plaintiff's CERCLA claims apply with equal force to plaintiff's claims under the HSAA.  (City's Mem. Supp. Mot. Summ. J. 7 n.4; Pl.'s Mem. Supp. Opp'n Summ. J. 1:5-2:1.)

B.   "Facility"

CERCLA defines the term "facility" as follows:

The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).  The conjunction "or" between subparts (A) and (B) establishes "two distinct definitions of what might constitute a facility."  Sierra Club v. Seaboard Farms Inc., 387 F.3d 1167, 1171 (10th Cir. 2004).  Thus, "[a]n area fulfilling the requirements of [subpart (A)] need not also meet the requirements of [subpart (B)] to be considered a 'facility,' and vice versa."  Id. (quoting United States v. Twp. of Brighton, 153 F.3d 307, 322 (6th Cir. 1998) (Moore, J., concurring)) (internal quotation marks omitted).

In light of the general language and disjunctive structure of § 9601(9), the Supreme Court and others have remarked that "the term 'facility' enjoys a broad and detailed definition."  United States v. Bestfoods, 524 U.S. 51, 56 (1998); see, e.g., Seaboard Farms, 387 F.3d at 1174 ("[C]ircuits that have applied the defined term "facility" have done so with a broad brush."); Uniroyal Chem. Co., Inc. v. Deltech Corp., 160

8

F.3d 238, 245 (5th Cir. 1998) ("[I]t is apparent that facility is defined in the broadest possible terms . . . ."); 3550 Stevens, 915 F.2d at 1358 n.10 ("[T]he term 'facility' has been broadly construed by the courts, such that 'in order to show that an area is a "facility," the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there.'" (quoting United States v. Metate Asbestos Corp., 584 F. Supp. 1143, 1148 (D. Ariz. 1984))).  Indeed, one annotation recently noted that "it does not appear that any court has ever held that one or more of the defining terms in [42 U.S.C. § 9601(9)] was inapplicable in a particular case." William B. Johnson, Annotation, What Constitutes "Facility" Within the Meaning of Section 101(9) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601(9)), 147 A.L.R. Fed. 469 § 2(a) (1998 & Supp. 2009) [hereinafter Johnson, What Constitutes "Facility"].

Despite CERCLA's expansive definition of "facility," the City contends that CERCLA's "express terms" exempt its sewer from this classification.  (City's Mem. Supp. Mot. Summ. J. 8:5.) To support its argument, the City ascribes great significance to the parenthetical in subpart (A): "The term 'facility' means (A) any . . . pipe or pipeline (including any pipe into a sewer or publicly owned treatment works) . . . ."  42 U.S.C. § 9601(9)(A) (emphasis added).  The City suggests that by specifically mentioning "sewer" in this parenthetical and neglecting to include it in the preceding enumerated facilities, Congress "had sewers in mind" but deliberately kept them off the list.  (City's Mem. Supp. Mot. Summ. J. 8:16-17.)  Similarly, the City argues

1   that the plain meaning of "pipe or pipeline" includes sewers;
2   therefore, the parenthetical in subpart (A) explaining that pipes
3   connected to sewers are facilities is redundant.  (City's Mem.
4   Supp. Summ. J. 8:22-9:10.)  The only way to make this
5   parenthetical functional, the City asserts, is to conceive of
6   sewers as non-facilities; under this interpretation, the
7   parenthetical clarifies that pipes remain facilities even if they
8   are connected to non-facilities.  (Id.)

9           As the City acknowledges, several other courts have
10  considered this argument and have rejected it.  See Westfarm
11  Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n, 66 F.3d
12  669, 678-80 (4th Cir. 1995); United States v. Union Corp., 277 F.
13  Supp. 2d 478, 486-87 (E.D. Pa. 2003); see also United States v.
14  Meyer, 120 F. Supp. 2d 635, 639 (W.D. Mich. 1999); City of Bangor
15  v. Citizens Commc'ns Co., No. 02-183, 2004 WL 483201, at *11 (D.
16  Me. Mar. 11, 2004) (Kravchuk, Mag. J.), aff'd, 2004 WL 2201217,
17  at *1 (D. Me. May 5, 2004).  Nonetheless, the City correctly
18  notes that these decisions rely almost exclusively on the
19  reasoning provided by the Fourth Circuit in Westfarm, and because
20  these decisions are not binding on this court, the City argues
21  that their "tortured construction of 'facility'" should be
22  rejected.  (City's Mem. Supp. Mot. Summ. J. 10:7-17.)

23          1.   The Westfarm Holding

24          In Westfarm, a property owner brought a cost recovery
25  action under CERCLA against the Washington Suburban Sanitary
26  Commission ("WSSC"), a state agency that operated a sewer system.
27  66 F.3d at 674, 676.  Like the instant case, Westfarm involved a
28  dry cleaning operation that had contaminated the soil and

groundwater on plaintiff's property by pouring PCE "down a sink
drain into the connected sewer line." <u>Id.</u> at 674.  Apparently,
the PCE "was flowing [into plaintiff's property] through leaks in
the sewer system." <u>Id.</u> at 673.  WSSC moved for summary judgment,
arguing in part that "the language of the statute evinces a
Congressional intent to exclude 'publicly owned treatment works,'
or POTWs, such as WSSC's sewer, from the definition of
'facility.'" <u>Id.</u> at 678.  Like the City in this case, WSSC
specifically argued that "to conclude that a POTW is a 'facility'
would be to render the parenthetical language above, 'including
any pipe into a sewer or publicly owned treatment works'
surplusage, contrary to traditional rules of statutory
interpretation." <u>Id.</u>

        While agreeing that the parenthetical appeared to be
surplusage when viewed in isolation, the Fourth Circuit
proceeding to hold:

> Reading CERCLA as a whole . . . leads to the inescapable
> conclusion that Congress did not intend to exclude POTWs
> from liability.  Congress expressly abrogated state
> sovereign immunity under CERCLA, thereby subjecting
> "facilities" owned and operated by state governments to
> liability.  A narrow exception to the definition of
> "owner or operator," however, was carved to exclude state
> and local governments from liability when they have
> acquired ownership of a facility "involuntarily through
> bankruptcy, tax delinquency, abandonment, or other
> circumstances in which the government involuntarily
> acquires title." . . . [I]f Congress had intended to
> exclude state and local governments from liability in
> other situations . . . Congress would have either: (a)
> excluded all state and local governments from the
> definition of "owner or operator," rather than limiting
> the exclusion to the involuntary acquisition situation;
> or (b) included POTWs in the list of entities excluded
> from the definition of "owner or operator."

<u>Id.</u> at 678-89 (citations omitted).  In order to explain the
apparent surplusage in the parenthetical in subpart (A), the

11

Fourth Circuit concluded that, "[i]n the context of the entire statute, it appears that Congress added [the parenthetical] to emphasize the point that pipes leading into sewers or POTWs are the responsibility of the owner or operator of the pipes, not the sewer or POTW." Id. at 679.

## 2.   Limiting the City's Proposed Interpretation

Before weighing the merits of the City's arguments and examining the Fourth Circuit's rationale in Westfarm, the court first notes the self-imposed limitations on the City's interpretation of subpart (A).   Specifically, the City "does not assert [that] public entities are or should be generally immune from CERCLA liability."   (City's Mem. Supp. Mot. Summ. J. 14:27-15:1.)   This qualification to the City's argument appears necessary, given that "CERCLA expressly includes municipalities, states, and other political subdivisions within its definition of persons who can incur . . . liability under § 9607," and because the Supreme Court has held that a "'cascade of plain language' clearly demonstrates Congress aimed to abrogate sovereign immunity for the states." Murtha, 958 F.2d at 1198 (quoting Pennsylvania v. Union Gas Co., 491 U.S. 1, 7-13 (1989)).

Having acknowledged that CERCLA does not generally distinguish between private and public parties for purposes of liability, the City proceeds to claim that, "regarding sewers and waste treatment plans, Congress decided to treat public entities differently by not including such places as facilities."   (City's Mem. Supp. Mot. Summ. J. 14:27-15:1.)   In so arguing, the City implies that its proffered exception to CERCLA's broad definition of "facility" would be cabined to "the basic civic function[] of

having and maintaining a sewer system."  (<u>Id.</u> at 15:4-5.)

Although the City attempts to limit the scope of its proposed exception to CERCLA's definition of "facility," this limitation finds little support in the text of the statute. Assuming the parenthetical in subpart (A) evinces Congress's intent to exempt sewers from the definition of facility, there is no express language to indicate that this exemption would cover only <u>public</u> sewers.  Private sewers are common sources of environmental contamination, <u>see, e.g.</u>, <u>Mead Corp. v. Browner</u>, 100 F.3d 152, 154 (D.C. Cir. 1996); <u>State of Vermont v. Staco, Inc.</u>, 684 F.Supp. 822, 832-33 (D. Vt. 1988), and it would seem that the owner of a private sewer could similarly avail subpart (A)'s parenthetical as an exemption from CERCLA's definition of "facility."

Of course, applying the canon of statutory construction <u>noscitur a sociis</u>, the juxtaposition of "sewer" and "publicly owned treatment works" may suggest that only public sewers are contemplated by the word "sewer."  <u>See</u> <u>James v. United States</u>, 550 U.S. 192, 222 (2007) ("<u>[N]oscitur a sociis</u> is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: '[A] word is known by the company it keeps'" (quoting <u>Jarecki v. G.D. Searle & Co.</u>, 367 U.S. 303, 307 (1961)) (second alteration in original)).  However, because some sources define the term "publicly owned treatment works" to include public sewers, the word "sewer" could just as plausibly be read to refer to private sewers in order to avoid rendering "publicly owned treatment works" superfluous.  <u>See, e.g.</u>, Me. Rev. Stat. Ann. tit. 38, § 414-B ("'Publicly owned treatment works' includes

13

1  sewers, pipes or other conveyances . . . .”); Westfarm, 66 F.3d

2  at 678 (using the terms interchangeably).

3          In sum, although the City attempts to limit its

4  interpretation of subpart (A) to apply solely to public sewers,

5  it is difficult to articulate a persuasive, textual basis for not

6  also exempting private sewers, which both parties agree would be

7  inconsistent with the aims of CERCLA.  (See City’s Mem. Supp.

8  Mot. Summ. J. 14:27-15:8; Pl.’s Mem. Supp. Opp’n Summ. J. 11:7-

9  8); see also United States v. Meyer, 120 F. Supp. 2d 635, 639-40

10  (W.D. Mich. 1999) (holding that a private sewer system that had

11  contaminated the soil and groundwater with hexavalent chromium

12  and other hazardous materials was a “facility” under CERCLA).

13          3.   Assessing the City’s Interpretation

14          As to the City’s claim that the “absence of sewers from

15  the definitional list” is “quite telling,” both caselaw and

16  CERCLA’s legislative history demonstrate that the language

17  defining facility was intended to be broad and inclusive, see

18  Uniroyal, 160 F.3d at 246-47; The Envtl. Law. Inst., Superfund: A

19  Legislative History xviii (Helen C. Needham & Mark Henefee eds.,

20  1982); 126 Cong. Rec. S14964-65 (1980), and there is no dispute

21  that sewers could easily be encompassed within the meaning of

22  “structure,” “equipment,” “pipe,” or “pipeline.”  Therefore, in

23  this context, the failure to specifically single out a particular

24  object or edifice does not indicate congressional intent to

25  exclude it from the expansive meaning of “facility.”  See, e.g.,

26  United States v. Iron Mountain Mines, Inc., 812 F. Supp. 1528,

27  1549 (E.D. Cal. 1992) (Schwartz, J.) (“While [the defendant] is

28  correct that Congress did not specifically identify mines in this

provision, Congress also did not specifically identify factories, plants, laboratories, laundromats, warehouses, dumps, or quarries--any number of places from which hazardous wastes might be released.").

Furthermore, assuming that some justification may exist for exempting public sewers from CERCLA liability, it would be strange for Congress to do so through the artful placement of a parenthetical within CERCLA's definition of "facility."  As the Fourth Circuit recognized in Westfarm, Congress unambiguously exempted local governments from CERCLA liability for facilities acquired "'involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title.'"  66 F.3d at 678 (quoting 42 U.S.C. § 9601(20)(D)).  By expressly exempting municipalities in this regard, the canon of statutory construction expressio unius est exclusio alterius would suggest that Congress did not intend an additional exemption for municipalities with respect to sewers.  Id. at 678-79; see Blausey v. U.S. Tr., 552 F.3d 1124, 1133 (9th Cir. 2009) ("[T]he enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded."); see also Murtha, 958 F.2d at 1199 ("These express exceptions to liability are strong evidence that municipalities are otherwise subject to CERCLA liability.").

At a more fundamental level, the City also fails to explain why Congress would exempt public sewers from the definition of "facility" as opposed to, for example, publicly owned water mains or landfills.  Under the City's proposed

construction, municipalities would still be strictly liable for

the release of hazardous substances from these facilities, <u>see,</u>

<u>e.g.</u>, <u>Transp. Leasing Co. v. State of Cal. (CalTrans)</u>, 861 F.

Supp. 931, 939 (C.D. Cal. 1993) (holding municipalities liable

for contamination from a landfill even though their conduct

constituted a "non-contributory exercise of sovereign power"),

yet they would have immunity for even deliberate environmental

contamination via sewers, <u>see, e.g.</u>, <u>Uniroyal Chem. Co., Inc. v.</u>

<u>Deltech Corp.</u>, 160 F.3d 238, 244 (5th Cir. 1998) ("CERCLA

liability cannot be imposed unless the site in question

constitutes a facility.").   The City has provided no persuasive

justification for inserting such inconsistency into CERCLA's

treatment of public facilities.[1]   <u>See generally</u> <u>Murtha</u>, 958 F.2d

---

[1]   In a footnote, the City refers to a Note from the
Stanford Environmental Law Journal to suggest that
"distinguishing treatment of sewers is consistent [with] the
Resource Conservation and Recovery Act [("RCRA"), 42 U.S.C. §§
6901-6992k] and . . . the Clean Water Act [("CWA"), 33 U.S.C. §§
1251-1387]."  (City's Mem. Supp. Mot. Summ. J. 15 n.13.)  As that
Note explains, however, the CWA simply "requires that industrial
facilities substantially treat their waste prior to discharging
it into a POTW," and the RCRA "stipulates that public sewage
authorities are responsible for the management and treatment of
domestic sewage."  Robert M. Frye, Note, <u>Municipal Sewer</u>
<u>Authority Liability Under CERCLA: Should Taxpayers Be Liable For</u>
<u>Superfund Cleanup Costs?</u>, 14 Stan. Envtl. L.J. 61, 84 (1995).
Therefore, insofar as these statutes relate to sewers, they are
merely preventative in nature, not remedial.  <u>See, e.g.</u>, <u>United</u>
<u>States v. Hartsell</u>, 127 F.3d 343, 350 (4th Cir. 1997) (noting
that the CWA "provides for the promulgation of regulations which
will <u>limit or prohibit</u> the discharge of pollutants into POTWs."
(citing 33 U.S.C. § 1317) (emphasis added)); <u>United States v.</u>
<u>E.I. du Pont de Nemours & Co., Inc.</u>, 341 F. Supp. 2d 215, 237
(W.D.N.Y. 2004) ("RCRA was designed to address present and
prospective threats.").  Far from indicating that CERCLA should
not apply to sewers, the RCRA and CWA imply that Congress
recognized sewers as a potential source of environmental
contamination and suggest that CERCLA has a complimentary role to
play.  <u>See, e.g.</u>, <u>S.C. Dep't of Health & Envtl. Control v.</u>
<u>Commerce & Indus. Ins. Co.</u>, 372 F.3d 245, 256 (4th Cir. 2004)
("Although the aims of RCRA and CERCLA are related, each serves a

at 1199 ("To construe CERCLA as providing an exemption for
municipalities arranging for the disposal of municipal solid
waste that contains hazardous substances simply because the
municipality undertakes such action in furtherance of its
sovereign status would create an unwarranted break in the
statutory chain of responsibility.").

While arguing that subpart (A) implicitly exempts
public sewers from the definition of "facility," the City also
neglects to consider the import of subpart (B), which further
defines facility to include "any site or area where a hazardous
substance has been deposited, stored, disposed of, or placed, or
otherwise come to be located." 42 U.S.C. 9601(9)(B). The City
simply disregards this provision, asserting that it applies only
to "land . . . where pollutants migrate," as opposed to other
objects or edifices beneath or affixed to the surface. (City's
Mem. Supp. Mot. Summ. J. 8:8-9 (emphasis added); see id. at 12
n.10.) This parsimonious view of subpart (B), however, is far
from well-established. See, e.g., Sierra Club, Inc. v. Tyson
Foods, Inc., 299 F. Supp.2d 693, 708 (W.D. Ky. 2003) (applying
subpart (B) to include poultry houses and litter sheds); Meyer,
120 F. Supp. 2d at 638-39 (applying subpart (B) to include
private sewer lines); Clear Lake Props. v. Rockwell Int'l Corp.,
959 F. Supp. 763, 767-68 (S.D. Tex. 1997) (applying subpart (B)
to include an underground laboratory). See generally Dedham

separate and unique purpose. . . . Indeed, as the Supreme Court
has observed, RCRA is not principally designed to 'compensate
those who have attended to the remediation of environmental
hazards.'" (quoting Meghrig v. KFC W., Inc., 516 U.S. 479, 483
(1996))).

1  Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1151
2  (1st Cir. 1989) (interpreting subpart (B) to encompass "every
3  conceivable place where hazardous substances come to be
4  located"); Clear Lake, 959 F. Supp. at 768 (stating that subpart
5  (B) "is broad enough to encompass virtually any place at which
6  hazardous wastes have been found to be located").

7       To be sure, subpart (B) may be inapplicable here
8  because the final destination of the PCE appears to be the soil
9  and groundwater near Suite K rather than the sewers themselves.
10 See United States v. Bliss, 667 F. Supp. 1298, 1305 (E.D. Mo.
11 1987) (explaining that subpart (A) refers to facilities that
12 release hazardous substances, while subpart (B) refers to
13 facilities where hazardous substances ultimately "come to be
14 located"); (see also Pearlman Decl. Ex. I at 2-9, 21-23).
15 Nonetheless, juxtaposing subpart (B) with the City's
16 interpretation of subpart (A) illustrates a strange consequence
17 of the City's construction of the latter; under the City's view,
18 a sewer would not be a facility if it leaked a hazardous
19 substance into the surrounding soil or groundwater, but it would
20 be a facility if the hazardous substance came to remain within
21 the sewer itself.  See Meyer, 120 F. Supp. 2d at 638-39 (finding
22 private sewer lines to be facilities because hazardous substances
23 were discovered therein); see also Brookfield-N. Riverside Water
24 Comm'n v. Martin Oil Mktg., Ltd., No. 90-5884, 1992 WL 63274, at
25 *5 (N.D. Ill. Mar. 12, 1992) ("[N]ot only was the construction
26 site a 'facility,' but after hazardous substances entered the
27 water main, the water main too became a 'facility.'").  The City
28 provides no justification as to why Congress would intend such

18

1   asymmetry in the definition of "facility" as applied to sewers.

2        4.   Whether the City's Interpretation Is Required

3             to Avoid Surplusage

4        Having noted several weaknesses in the City's proposed

5   interpretation of subpart (A), the court proceeds to address the

6   City's contention that, absent this interpretation, the

7   parenthetical in subpart (A) would be superfluous.  It is well-

8   established that courts should express a "deep reluctance to

9   interpret a statutory provision as to render superfluous other

10  provisions in the same enactment," Pa. Dep't of Pub. Welfare v.

11  Davenport, 495 U.S. 552, 562 (1990); nonetheless, this maxim is

12  not absolute and must yield to ensuring that the overall purposes

13  of a statute are furthered, see United States v. Atl. Research

14  Corp., 551 U.S. 128, 137 (2007) ("It is appropriate to tolerate a

15  degree of surplusage rather than adopt a textually dubious

16  construction that threatens to render [an] entire provision a

17  nullity."); Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004) (noting

18  that surplusage does "not always produce ambiguity" and that the

19  "preference for avoiding surplusage is not absolute").

20       As discussed previously, CERCLA is aimed at assuring

21  "that those responsible for any damage, environmental harm, or

22  injury from chemical poisons bear the costs of their actions."

23  S. Rep. No. 96-848, at 13 (1980); accord Mardan Corp. v. C.G.C.

24  Music, Ltd., 804 F.2d 1454, 1455 (9th Cir. 1986).  To interpret

25  subpart (A)'s parenthetical to automatically exempt public sewers

26  from CERCLA lawsuits--not withstanding the fault or

27  "responsibility" of the owner or operator for any environmental

28  harms--appears to conflict with CERLCA's comprehensive remedial

19

purpose.  It would seem, moreover, that a court should be
tolerant of occasional redundancy and surplusage where, as here,
the statute in question "has been criticized frequently for
inartful drafting and numerous ambiguities attributable to its
precipitous passage."  Rhodes v. County of Darlington, S.C., 833
F. Supp. 1163, 1174 (D.S.C. 1992) (quoting Artesian Water Co. v.
Gov't of New Castle County, 659 F. Supp. 1269, 1277 (D. Del.
1987)); see Uniroyal, 160 F.3d at 246 ("Due to its hurried
passage, it is widely recognized that many of CERCLA's provisions
lack clarity and conciseness.  A multitude of courts have roundly
criticized the statute as vague [and] contradictory . . . .");
La.-Pac. Corp. v. Beazer Materials & Servs., Inc., 811 F. Supp.
1421, 1428 (E.D. Cal. 1993) (Karlton, J.) ("Given the haste in
which [CERCLA] was drafted, it is not unreasonable to conclude
that the critical comma was inadvertently omitted." (citations
omitted)).

More importantly, Westfarm's alternative, non-
superfluous interpretation of subpart (A)'s parenthetical--while
perhaps underdeveloped in that case--is by no means
"Procrustean."  (City's Mem. Supp. Summ. J. 10:2.)  In Westfarm,
the Fourth Circuit suggested that the parenthetical "emphasize[d]
the point that pipes leading into sewers or POTWs are the
responsibility of the owner or operator of the pipes, not the
sewer or POTW."  Id. at 679.  A substantial body of caselaw has
considered the issue to which the Fourth Circuit alluded, namely,
how to delineate among several sites, structures, or items
falling under CERCLA's definition of "facility" in order to
determine the relevant owners, operators, and other responsible

20

parties.  See, e.g., Sierra Club v. Seaboard Farms Inc., 387 F.3d 1167, 1170-71 (10th Cir. 2004); United States v. Twp. of Brighton, 153 F.3d 307, 312-13 (6th Cir. 1998).

For example, in Brighton, a township sought to escape liability for response costs incurred by the federal government in cleaning up a "dumpsite" used by the township and other parties.  153 F.3d at 311-12.  The township argued that the "facility" in question should not be defined to include the township's ownership interest because the township only used the southwest corner of the site, which was separate from the "hot zone" of the government's cleanup efforts.  Id. at 313.  The Sixth Circuit rejected this argument, however, concluding that "even though township residents generally left their refuse in the southwest corner, it appears that the entire property was operated together as a dump."  Id.

Pipes and pipelines present a unique aspect of this problem; because pipes are "long hollow cylinders . . . used for conducting a fluid, gas, or finely divided solid," Webster's Third International Dictionary 1721 (1976), a court may be uncertain as to where these types of "facilities" begin or end. Indeed, as the Sixth Circuit noted in Brighton, the boundaries of a facility need not be coterminous with the contamination.  See id. at 313 ("[A]n area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility,' even if it contains parts that are non-contaminated.").

Thus, in light of this uncertainty, the parenthetical in subpart (A) indicates that pipes and pipelines may be divided

1  into specific ownership-segments for purposes of determining the

2  relevant "facilities" under CERCLA.  This interpretation has the

3  serviceable result of enabling cost recovery actions against

4  owners and operators of particular portions of a pipeline, rather

5  than against all of the unaffiliated owners and operators

6  involved in a network of pipes.  Otherwise, every time a private

7  pipeline leaked hazardous substances into the subsurface, the

8  owners of sewers or treatment works would be implicated simply by

9  having their equipment connected to the network.  See Westfarm,

10  66 F.3d at 669 ("[P]ipes leading into sewers or POTWs are the

11  responsibility of the owner or operator of the pipes, not the

12  sewer or POTW.").  Therefore, while the redundancy identified by

13  the City does not necessarily require resolution, the court finds

14  that the interpretation provided here and in Westfarm adequately

15  addresses the issue in a manner more consistent with CERCLA's

16  treatment of municipalities than the City's proposed

17  construction.

18              5.   The Ninth Circuit and Westfarm

19              In its criticism of Westfarm, the City also argues that

20  the Fourth Circuit's analysis was questioned by the Ninth Circuit

21  in Fireman's Fund Insurance Co. v. City of Lodi, California, 302

22  F.3d 928 (9th Cir. 2002).  In that case, the City of Lodi sought

23  to enforce a municipal ordinance modeled after CERCLA and the

24  HSAA to remedy contamination resulting from the disposal of PCE

25  in municipal sewers.  See id. at 934-37.  To determine whether

26  the municipal ordinance was preempted by CERCLA and the HSAA, the

27  Ninth Circuit noted that the argument in favor of preemption was

28  "rooted in the . . . assumption that Lodi is a [Potentially

22

Responsible Party ("PRP")]." Id. at 946.  The Ninth Circuit

continued:

> While we decline to decide whether Lodi is a PRP on the
> record before us, we note that it is doubtful whether
> Lodi may be considered a PRP merely as a result of
> operating its municipal sewer system. See Lincoln
> Prop[s]., Ltd. v. Higgins, 823 F. Supp. 1528, 1539-44
> (E.D. Cal. 1992) (holding that a municipal operator of a
> sewer system that leaked hazardous waste could rely on a
> third-party defense to avoid liability under CERCLA).
> But see Westfarm Assocs. v. Wash. Suburban Sanitary
> Comm'n, 66 F.3d 669, 675-80 (4th Cir. 1995) (holding that
> a municipal operator of a sewer system is liable for the
> acts of a third party that discharges hazardous waste
> into the system). See also Robert M. Frye, Municipal
> Sewer Authority Liability Under CERCLA: Should Taxpayers
> Be Liable For Superfund Cleanup Costs?, 14 Stan. Envtl.
> L.J. 61 (1995) (criticizing the Westfarm decision and
> arguing that municipalities should not bear CERCLA
> liability for operating sewer systems because some
> leakage from sewers is unavoidable and the parties
> dumping chemicals into the sewer, not the operator of the
> sewer, is the responsible party). We remand to the
> district court the question of whether Lodi is a PRP.

Id.

Although this dicta evinces some disagreement with

Westfarm, this tension appears to center on the application of

the innocent-party defense rather than the interpretation of

"facility."  Indeed, the case favorably cited by the Ninth

Circuit--Lincoln Properties, Ltd. v. Higgins--involved a county

sewer operator that successfully asserted the innocent-party

defense; the parties in Lincoln Properties, however, had

expressly stipulated that the public sewer in question was a

"facility" under CERCLA.  823 F. Supp. 1528, 1533 n.2, 1539-44

(E.D. Cal. 1992) (Levi, J.).  The explanatory parentheticals for

Westfarm and Frye's Note also do not reference any discussion of

the term "facility" under CERCLA.  Fireman's Fund, 302 F.3d at

946.  On remand from the Ninth Circuit, moreover, neither the

district court nor the parties in <u>Fireman's Fund</u> interpreted the

Ninth Circuit to question whether a municipal sewer was a

"facility" under CERCLA; instead, the district court concluded

that the City of Lodi was in fact a PRP.  <u>See</u> <u>Fireman's Fund Ins.</u>

<u>Co. v. City of Lodi, Cal.</u>, 296 F. Supp. 2d 1197, 1206-07 (E.D.

Cal. 2003) (Damrell, J.).

      Accordingly, when the Ninth Circuit's reference to

<u>Westfarm</u> is examined in context, there is no indication that the

Ninth Circuit would interpret "facility" differently than the

Fourth Circuit.

                6.   <u>The City's Policy Arguments</u>

      The City finally proffers several policy arguments to

support an exemption for its public sewer from CERCLA's

definition of "facility."  These policy arguments generally

invoke the City's perception of the equities in this case,

asserting that CERCLA's purpose "is thwarted by imposing

liability on a city merely because the polluter uses the public

sewer."  (City's Mem. Supp. Mot. Summ. J. 13:4-5.)  The City

reiterates that it was "unaware of the contaminant's presence"

and distinguishes <u>Westfarm</u> and its progeny on the grounds that

they "involved <u>deliberate/knowing conduct</u> by the party

responsible for the sewer."  (<u>Id.</u> at 10:8-21; <u>see</u> <u>id.</u> at 14:13

("[The City] derived no economic benefit from the disposal of PCE

wastewater into the sewer."); <u>id.</u> at 14:13 ("[E]ven assuming the

sewer did leak PCE, no evidence [suggests] the sewer was thus

faulty in the sense of [its] intended function and foreseeable

usage.").)  These arguments, however, are unavailing.  As courts

have repeatedly explained,

> CERCLA is a strict liability statute, and liability can attach even when the generator has no idea how its waste came to be located at the facility from which there was a release. The three statutory defenses enumerated in § 9607(b), including defenses for "an act of God," "an act of war," or "an act or omission of a third party other than an employee or agent of the defendant," are "the only [defenses] available, and . . . the traditional equitable defenses are not."

Pakootas v. Teck Cominco Metals, Ltd., 452 F.3d 1066, 1078 (9th Cir. 2006) (quoting California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co., 358 F.3d 661, 672 (9th Cir. 2004)) (citation omitted) (alteration in original); see La.-Pac. Corp. v. Beazer Materials & Servs., Inc., 811 F. Supp. 1421, 1429 (E.D. Cal. 1993) (Karlton, J.) ("The imposition of strict liability means that defendants may be required to contribute to a cleanup even though they were not responsible, in a culpability sense, for the creation of the condition.").

Therefore, although the City's policy arguments may lend support to its innocent-party defense, they do not comport with the strict-liability scheme underlying a prima facie case for cost recovery. To be sure, while a party's relative culpability may influence the applicability of the innocent-party defense in a particular case, it cannot dictate the meaning of the word "facility" to be applied in all cost recovery lawsuits.[2]

---

[2] While immaterial to the meaning of "facility," the City's arguments regarding the allocation of responsibility may also be pertinent to the contribution phase of this action. CERCLA specifically instructs that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Factors which may be considered include:

> (1) The ability of the parties to distinguish their contribution to the discharge, release, or disposal of hazardous waste;

1    Accordingly, having considered the merits of the City's
2   proposed interpretation exempting sewers from CERCLA's definition
3   of "facility," including whether the exemption could be limited
4   to public sewers, whether it would be consistent with other
5   statutory provisions and CERCLA's policy goals, and whether it is
6   supported by caselaw within and beyond the Ninth Circuit, the
7   court concludes that the sewer in this case is a "facility" for
8   purposes of CERCLA.

9        C.    "Owner" or "Operator"

10    The fourth element of a prima facie case for cost
11   recovery requires that the defendant be "within one of four
12   classes of persons subject to the liability provisions of [42
13   U.S.C. § 9607(a)]."   3550 Stevens Creek Assocs. v. Barclays Bank
14   of Cal., 915 F.2d 1355, 1357 (9th Cir. 1990).   Here, the parties
15   agree that only two of the four classes allegedly apply to the
16   City, namely, "the [present] owner and operator of a vessel or a
17   facility" and "any person who at the time of disposal of any

18   ————————————————

19        (2)   The amount of the hazardous waste involved;

20        (3)   The degree of the toxicity of the hazardous waste
              involved;

21
22        (4)   The degree of care exercised by the parties with
              respect to the hazardous waste concerned; and

23        (5)   The degree of cooperation by the parties with
              government officials to prevent any harm to the
24            public health or the environment.

25   Weyerhaeuser Co. v. Koppers Co., Inc., 771 F. Supp. 1420, 1426
    (D. Md. 1991).   Other factors include a party's knowledge or
26   acquiescence to the release of hazardous waste and whether a
    party has benefitted from the contamination.   Id.   "Thus, the
27   contribution stage, and not the liability stage, is appropriate
    for considerations of the . . . relative degree of fault."   Nw.
28   Mut. Life Ins. Co. v. Atl. Research Corp., 847 F. Supp. 389, 396
    (E.D. Va. 1994).

26

hazardous substance owned or operated any facility at which such

hazardous substances were disposed of."   42 U.S.C. §

9607(a)(1)(2); (see City's Mem. Supp. Summ. J. 6:14-23; Pl.'s

Mem. Supp. Opp'n Summ. J. 16:12-21:14; TAC ¶¶ 14, 30-31.)

The City further submits that, "[w]ithout question," it

"owned and operated the sewer main." (City's Mem. Supp. Summ. J.

15:11.)   Nonetheless, the City contends that "even if a municipal

sewer is generally deemed a facility, it is not the facility by

which owner or operator status is gauged" in this case. (Id. at

15:11-13.)   The City suggests that "there are not multiple

facilities here . . . but rather one--the entire area of land to

be remedied." (Id. at 15:22-23.)   Therefore, because the City is

not the owner or operator of the "entire area of land to be

remedied," the City argues that plaintiff cannot satisfy the

fourth element of its prima facie case.

None of the cases cited by the City suggest that, when

confronted with several facilities, a court must conceive of them

as a single site to determine the relevant owners and operators.

Rather, the cited authorities indicate that courts are simply

permitted to so in appropriate cases.   See, e.g., Axel Johnson,

Inc. v. Carroll Carolina Oil Co., Inc., 191 F.3d 409, 419 (4th

Cir. 1999) ("This is not to say that every widely contaminated

property must be considered a single facility.   But where, as

here, the only arguments in favor of designating multiple

facilities are weak in themselves and merely represent

thinly-veiled attempts by a party to avoid responsibility for

contamination, designation of the property as a single facility

is appropriate."); Cytec Indus., Inc. v. B.F. Goodrich Co., 232

F. Supp. 2d 821, 836 (S.D. Ohio 2002) ("This court concludes that usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management.").

To be sure, courts and commentators have frequently observed that "there does not appear to be a limit to the number of 'facilities' that can be created by the migration of hazardous substances, even if hazardous substances 'come to be located' at several locations in a particular case." Johnson, What Constitutes "Facility" § 2(b); see United States v. Meyer, 120 F. Supp. 2d 635, 639 (W.D. Mich. 1999) ("Because hazardous substances may come to be located in several discrete locations in a given case, there may be several 'facilities' related to a single hazardous waste discharge or disposal."); Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc., No. 92-5068, 1995 WL 866395, at *4 (E.D. Cal. Nov. 15, 1995) (Wanger, J.) ("Contrary to Brown & Bryant's arguments, a single geographical location may contain multiple 'facilities.'  'Facilities' may even be contained within other 'facilities.'"); Brookfield-N. Riverside Water Comm'n v. Martin Oil Mktg., Ltd., No. 90-5884, 1992 WL 63274, at *5 (N.D. Ill. Mar. 12, 1992) ("[N]ot only was the construction site a 'facility,' but after hazardous substances entered the water main, the water main too became a 'facility.'").

Although certain considerations may counsel in favor of a single facility in some cases, see Cytec, 232 F. Supp. 2d at 836, the primary source for determining the number of relevant

facilities is the plaintiff's complaint, see La.-Pac. Corp. v.
Beazer Materials & Servs., Inc., 811 F. Supp. 1421, 1431 (E.D.
Cal. 1993) (Karlton, J.); Burlington N. R.R. Co. v. Woods Indus.,
Inc., 815 F. Supp. 1384, 1389-90 (E.D. Wash. 1993); see also
United States v. Atchison, Topeka & Santa Fe Ry. Co., Nos. 92-
5068 et al., 2003 WL 25518047, at *47 (E.D. Cal. July 15, 2003)
(Wanger, J.) ("If anything, courts defer to a plaintiff's
definition of the facility because the plaintiff is the master of
its claim and should be allowed to allege or conceptualize the
facility in any manner to suit liability, as long as the asserted
definition falls within the very broad statutory definition."),
rev'd on other grounds, 479 F.3d 1113 (9th Cir. 2007), rev'd, 129
S. Ct. 1870 (2009).

        For example, in Burlington the defendant owned a "fruit
drenching" business on a leasehold "immediately adjacent" to the
plaintiff's property, and over several decades the defendant
allowed hazardous pesticides to escape and seep into the soil on
plaintiff's parcel.  815 F. Supp. at 1387.  Although the
defendant's leasehold and the plaintiff's parcel were situated on
a contiguous area of land, the court looked to the theory of
liability alleged in the complaint and concluded that "the
drenching operation constitute[d] a separate CERCLA facility."
Id. at 1390.  Similarly, in Beazer, the court adopted the
plaintiff's single-site theory of liability and rejected
defendants' attempt to "parcel out [the] site into various
'facilities,'" noting that the plaintiff was the "master of its
complaint" and had "the discretion to formulate the legal
theories on which it would base its claim."  811 F. Supp. at

29

1431.   Together, <u>Burlington</u> and <u>Beazer</u> illustrate that, absent
unusual circumstances or obvious gamesmanship, the court should
determine the appropriate number of facilities in light of
plaintiff's theory of liability.

Here, plaintiff's TAC unambiguously alleges that the
City's sewer is a facility separate from the Woodland Shopping
Center site.  (<u>See</u> TAC ¶ 55 ("The Site and the sewer main on
Academy Lane . . . are each a 'facility' within the meaning of
CERCLA . . . .").)  Unlike the cases cited by the City,
permitting plaintiff to allege the existence of two facilities in
this case is not analogous to the "ridiculous" proposition that
"each barrel in a landfill is a separate facility."  <u>Union
Carbide Corp. v. Thiokol Corp.</u>, 890 F. Supp. 1035, 1043 (S.D. Ga.
1994); <u>see</u> <u>Axel Johnson</u>, 191 F.3d at 417.  Nor would plaintiff's
theory result in "piecemeal litigation," such as where "each
separate facility would give rise to a separate cause of action."
<u>Cytec</u>, 232 F. Supp. 2d at 836.  Instead, the relevant area here
can be "reasonably or naturally divided into multiple parts or
functional units," namely, the Woodland Shopping Center and the
sewer main owned by the City beneath Academy Lane.  <u>United States
v. Twp. of Brighton</u>, 153 F.3d 307, 313 (6th Cir. 1998).
Accordingly, because the City concedes that it is the owner and
operator of the sewer beneath Academy Lane,[3] and because this
sewer is a "facility" under CERCLA, plaintiff has satisfied the

_____

[3]   At oral argument, the City qualified its concession by
asserting that, although it owned and operated the sewer, it does
not meet the definition of an owner or operator under CERCLA.  In
the court's view, however, the verity of this qualification
requires conceiving of the entire contaminated site as a single
facility, which the court declines to do.

1    fourth prong of its prima facie case.

2        D.   Innocent-Party Defense

3            "An otherwise liable party may avoid CERCLA liability

4    only by establishing one of the three affirmative defenses set

5    forth in 42 U.S.C. § 9607(b)."  Lincoln Props., Ltd. v. Higgins,

6    823 F. Supp. 1528, 1539 (E.D. Cal. 1992) (Levi, J.).  "Because

7    CERCLA is a strict liability statute with few defenses, [§]

8    9607(b) . . . is narrowly construed."  United States v. Honeywell

9    Int'l, Inc., 542 F. Supp. 2d 1188, 1199 (E.D. Cal. 2008)

10   (Damrell, J.) (citing Lincoln Props., 823 F. Supp. at 1537,

11   1539); see Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d

12   863, 883 (9th Cir. 2001) (en banc) ("[T]o be sure, Congress

13   intended the defense to be very narrowly applicable, for fear

14   that it might be subject to abuse.").

15           Here, the City contends that it is absolved from

16   liability through § 9607(b)(3), the innocent-party defense.  To

17   establish this defense, a defendant must prove by a preponderance

18   of the evidence that (1) the release or threat of release of

19   hazardous substances was caused solely by the acts of a third

20   party and (2) the defendant exercised due care with respect to

21   the hazardous substances and took precautions against foreseeable

22   third-party acts or omissions.[4]  See Castaic Lake Water Agency v.

23   Whittaker Corp., 272 F. Supp. 2d 1053, 1079-80 (C.D. Cal. 2003);

24   see also 42 U.S.C. § 9607(b)(3).

25   _____

26       [4]   The innocent-party defense also requires that "the
     third party was not an employee or agent of the defendant."
27   Castaic Lake, 272 F. Supp. 2d at 1079; see 42 U.S.C. §
     9607(b)(3).  That aspect of the defense, however, is undisputed
28   in the instant case.  (See Pl.'s Opp'n City's Stmt. Undisputed
     Facts No. 7; City's Mem. Supp. Mot. Summ. J. 22:16-18.)

1    As the text of § 9607(b)(3) makes plain, this provision
2  is structured as an affirmative defense, and the City would have
3  the burden of establishing it at trial.  See Carson Harbor, 270
4  F.3d at 882-83; United States v. Stringfellow, 661 F. Supp. 1053,
5  1062 (C.D. Cal. 1987); see also Rosemary J. Beless, Superfund's
6  "Innocent Landowner" Defense: Guilty until Proven Innocent, 17 J.
7  Land Resources & Envtl. L. 247, 249-50 (1997).  Therefore, in
8  order to grant the City's motion for partial summary judgment on
9  the basis of this affirmative defense, the City "must make a
10  showing sufficient for the court to hold that no reasonable trier
11  of fact" could fail to find--by a preponderance of the evidence--
12  that it satisfies the requirements of § 9607(b)(3).  Ctr. For
13  Biological Diversity v. Abraham, 218 F. Supp. 2d 1143, 1153 (N.D.
14  Cal. 2002) (citing Calderone v. United States, 799 F.2d 254, 259
15  (6th Cir. 1986)); see id. at 1153-54 ("In such a case, the moving
16  party 'must establish beyond peradventure all of the essential
17  elements of its claim or defense to warrant judgment in [its]
18  favor.'" (quoting Fontenot v. Upjohn Co., 780 F.2d 1190, 1194
19  (5th Cir. 1986)) (alteration in original)).

20    1.   Solely Caused by Third-Parties

21    In applying the "sole cause" requirement of §
22  9607(b)(3), the court in Lincoln Properties previously noted that
23  it was "unclear whether Congress intended to make reference to
24  established concepts of causation, and, if so, which ones."  823
25  F. Supp. at 1540.  After a thorough examination of the CERCLA's
26  text and legislative history, as well as extant caselaw and
27  similar statutes, the court concluded that this element
28  "incorporates the concept of proximate or legal cause."  Id. at

32

1  1542.

2       Under this standard, "[i]f the defendant's release was
3  not foreseeable, and if its conduct--including acts as well as
4  omissions--was 'so indirect and insubstantial' in the chain of
5  events leading to the release, then the defendant's conduct was
6  not the proximate cause of the release and the third party
7  defense may be available." Id. at 1542.  The Eastern District of
8  California has continued to apply this standard, and several
9  courts in other districts have also adopted it.  See Honeywell,
10 542 F. Supp. 2d at 1199; United States v. Iron Mountain Mines,
11 Inc., 987 F. Supp. 1263, 1274 (E.D. Cal. 1997) (Levi, J.); see
12 also Castaic Lake, 272 F. Supp. 2d at 1081; Advanced Tech. Corp.
13 v. Eliskim, Inc., 96 F. Supp. 715, 718 (N.D. Ohio 2000);
14 United States v. Meyer, 120 F. Supp. 2d 635, 640 (W.D. Mich.
15 1999).

16      The only evidence the City presents to negate proximate
17 causation is the undisputed fact that the Taeckers poured PCE
18 into a floor drain connected to the sewer and that this violated
19 state and local laws.  (Pl.'s Opp'n City's Stmt. Undisputed Facts
20 Nos. 6, 8; see City's Reply 14:19-21; City's Mem. Supp. Summ. J.
21 22:16-18.)  While it is undisputed that the Taeckers were a cause
22 of the contamination, this fact alone does not demonstrate that
23 they were the sole cause, i.e., that the Taecker's activities
24 were unforeseeable.  Indeed, the fact that the Taeckers' conduct
25 violated state and local law--standing alone--does not render

26
27
28

this conduct unforeseeable as a matter of law.[5]  Restatement

(Second) of Torts § 448 (1965); see Benner v. Bell, 236 Ill. App.

3d 761, 767 (1992) ("[T]he negligent, or even criminal, act of a

third party which is a cause of the injury, may not insulate a

defendant from liability where that intervening cause is

foreseeable."); see also, e.g., Abdallah v. Caribbean Sec.

Agency, 557 F.2d 61 (3d Cir. 1977) (holding that the negligent

maintenance of a burglar alarm may be considered the proximate

cause of a burglary, notwithstanding an intervening criminal

act).

Although the City provides scant reason to conclude

that the Taeckers' conduct was unforeseeable, plaintiff has

adduced evidence suggesting the contrary.  First, it is evident

that the City was aware of the location of the sewer beneath

Academy Lane, as its presence has been noted on public

subdivision maps since 1928.  (See Pearlman Decl. Ex. J.

("Dickson Report") at 4.)  Building inspection records in the

City's custody also indicate that it was aware of the dry

---

[5]    In Lincoln Properties, the court asserted--without
citation to legal authority--that "[t]he County cannot be
expected to 'foresee' that its ordinance prohibiting the
discharge of cleaning solvents will be violated."  Id. at 1543
n.25.  The court later stated--again, without citation to legal
authority--that "[v]iolations of the law are not 'foreseeable
acts'; thus, the County did take reasonable precautions."  Id. at
1544.  Although the defendant in Lincoln Properties ultimately
came forward with additional evidence to satisfy its burden on
summary judgment, see id. at 1544, to the extent that Lincoln
Properties suggests that a third-party's violation of the law is
per se unforeseeable, the court must respectfully part ways with
that decision, see, e.g., Tolbert v. Tanner, 180 Ga. App. 441,
444 (1986) ("We find that under the facts of this case, a jury
could reasonably conclude that Brown's criminal action was
foreseeable and that appellees were negligent . . . .  The trial
court, therefore, erred by granting summary judgment in favor of
these appellees.").

cleaning operation next to Academy Lane and that the business had

obtained permits to operate machinery that discharged dry

cleaning solvents.  (See Pearlman Decl. Ex. O.)  City documents

also suggest that the Sunshine Cleaners, as well as other dry

cleaners in Woodland, were subject to inspection relating to the

City's industrial wastewater pretreatment program in September

1991.  (See Pearlman Decl. Ex. D1 at 15.)  In March 1992,

moreover, the RWQCB issued a report indicating that "leakage

through the sewer lines is the major avenue through which PCE is

introduced to the subsurface."  Cal. Reg'l Water Quality Control

Bd., Dry Cleaners--A Major Source of PCE in Ground Water 2 (1992)

[hereinafter, RWQCB, Dry Cleaners], available at

http://www.swrcb.ca.gov/rwqcb5/water_issues/

site_cleanup/.[6]  That report specifically stated:

> Based on site inspections, the majority of the cleaners
> had only one discharge point and that was to the sewer.
> Because of these discharges, staff investigated sewer
> lines as a possible discharge point for PCE to the soils.
> Samples taken from these lines indicated that liquids or
> sludges with high concentrations of PCE are lying on the
> bottom of the sewer.

Id. at 10.

Of course, plaintiff's evidence is by no means

conclusive; for example, because the Taeckers' disposal of

wastewater occurred between 1974 and 1991, plaintiff's evidence--

particularly the RWQCB report issued in 1992--does not

---

[6]    Although this report was not submitted for purposes of
the City's motion for partial summary judgment, the report is
referenced in the TAC (see TAC ¶ 31), is relied upon by
plaintiff's expert (see Dickson 3, 6), and is an official
government publication.  Accordingly, the court may properly take
judicial notice of this document.  See, e.g., Corrie v.
Caterpillar, Inc., 503 F.3d 974, 978 n.2 (9th Cir. 2007).

1   necessarily demonstrate that the City could have foreseen the
2   Taeckers' activities from the outset.  Nonetheless, it is
3   undisputed that the City did not take steps to remedy the leaks
4   in its sewer until 2004 (see Pearlman Decl. Ex. H ("City's Resp.
5   Interrogs.") Nos. 3, 6, 11-13), and expert testimony suggests
6   that PCE can continue to leak from sewers long after it is
7   originally deposited therein (see Dickson Report 6); see also
8   RWQCB, Dry Cleaners 10.  Furthermore, defendant--not plaintiff--
9   has the burden of establishing the innocent-party defense, and in
10  light of the foregoing evidence, genuine issues of material fact
11  remain as to whether the City was a proximate cause of a least
12  some of the contamination.

13              2.   Due Care and Precautions Against Foreseeable Acts
14                   or Omissions

15              The second aspect of the innocent-party defense--
16  whether defendant "exercised due care" and took appropriate
17  "precautions"--also involves the foreseeability of third-party
18  conduct; therefore, while the City's failure to carry its burden
19  on the "sole cause" element is fatal to its innocent-party
20  defense, see Honeywell, 542 F. Supp. 2d at 1200, a full
21  discussion of both elements of the defense is often appropriate,
22  see Lincoln Props., 823 F. Supp. at 1542-44.

23              Although the City again bears the burden of
24  demonstrating that it exercised due care and took appropriate
25  precautions, the City asserts that "no evidence, human or
26  documentary, pertaining to the sewer's construction,
27  inspection[,] or repair until the early 1990's exists."  (City's
28  Reply 14:25-27.)  Despite this dearth of evidence, the City

                                36

1  nonetheless contends that it exercised due care and took

2  appropriate precautions because the Taeckers' disposal of PCE

3  into the sewer was unforeseeable.  (Id. at 15:28-16:2 (arguing

4  that the "critical inquiry" is "whether the presence of PCE in

5  the sewer was foreseeable" and whether, "when that foreseeability

6  arose, . . . [the City] took reasonable steps to prevent

7  [contamination].".)

8          In a sense, the City's argument is circular; although

9  the City contends that no inspection or maintenance of the sewer

10 was required because the disposal of PCE was unforeseeable, the

11 disposal of PCE may very well have been unforeseeable because of

12 the City's failure to inspect or maintain the sewer.  The

13 innocent-party defense, however, "does not sanction . . . willful

14 or negligent blindness." United States v. Monsanto Co., 858 F.2d

15 160, 169 (4th Cir. 1988); United States v. A & N Cleaners &

16 Launderers, Inc., 854 F. Supp. 229, 243 (S.D.N.Y. 1994) ("Willful

17 or negligent ignorance about the presence of or threats

18 associated with hazardous substances does not excuse a PRP's

19 non-compliance with [the requirements of due care and appropriate

20 precautions]."); United States v. Bliss, 667 F. Supp. 1298, 1304

21 n. 3 (E.D. Mo. 1987) ("[W]illful ignorance of how a third party

22 disposes of a hazardous substance would preclude use of [the

23 innocent-party] defense.").

24         Here, the City provides no evidence to suggest that,

25 even absent notice of the presence of PCE, its maintenance of the

26 sewer was appropriate under the circumstances.  In contrast,

27 plaintiff has proffered the expert opinion of Bonneau Dickson, a

28 professional sanitary engineer, which states:

37

1
2
3
4

       Documents disclosed by the City included no proactive
sewer maintenance management system.  There were no
studies of leakage into the sewer system, no written
maintenance program, no sewer master plan, and no
prioritization of sewer maintenance.  Things of these
types are essential to proactive management of a sewage
collection system.

5

       . . .

6
7
8

       Such a reactive maintenance policy and program is
inadequate to prioritize the ancient sewer line at the
Woodland Shopping Center for study and maintenance or to
determine that it was in poor condition and was leaking.

9   (Dickson Report 6.)  Dickson's report also indicates that there

10  were "numerous defects in the existing sewer system" including

11  "40 cracked areas and several separated joints, chipped joints,

12  and/or sags."  (Id. at 5.)  Dickson further opined that "the rate

13  of sewer system leakage inevitably tends to get worse as the

14  sewers age" and that the City's sewer "is 78 years old and thus

15  well past its expected service life."  (Id. at 4-5.)  Ultimately,

16  the City does not dispute that it took no remedial action with

17  respect to its sewer until May 2004, when, having been sued in

18  connection with the contamination near the Woodland Shopping

19  Center, the City "sleeved" the sewer line to prevent future

20  leakage.  (City's Resp. Interrogs. No. 3.)

21         In light of the record currently before the court, this

22  case stands in stark relief to the cases upon which the City

23  relies for its innocent-party defense.  For example, in Lincoln

24  Properties, defendant established that it had "exercised due care

25  and taken reasonable precautions with respect to its sewer

26  system" and that its "sewer lines were built and have been

27  maintained in accordance with industry standards."  823 F. Supp.

28  at 1544.  Similarly, in Castaic Lake, the defendants "offer[ed]

1  evidence that their wells were designed and installed in

2  accordance with applicable construction standards at the time,

3  including pollution prevention standards."  272 F. Supp. 2d at

4  1083.  The City, however, offers no such evidence here; instead,

5  plaintiff has adduced evidence suggesting that the City practiced

6  "willful or negligent blindness" in maintaining its sewer.

7  Accordingly, having addressed the second aspect of the innocent-

8  party defense, the court again finds that genuine issues of

9  material fact preclude partial summary judgment in the City's

10 favor.

11 III. <u>Conclusion</u>

12          In light of the expansive definition of "facility"

13 under CERLCA and the flexibility plaintiff enjoys in structuring

14 its theory of liability, the City cannot establish that its

15 ownership of the sewer beneath Academy Lane eschews strict

16 liability under CERCLA and the HSAA.  Furthermore, because

17 genuine issues of material fact remain as to whether the Taeckers

18 were the sole cause of the contamination and whether the City

19 exercised due care and took appropriate precautions, the City

20 similarly fails to satisfy the innocent-party defense.

21 Accordingly, the court must deny the City's motion for partial

22 summary judgment.

23          IT IS THEREFORE ORDERED that the City's motion for

24 partial summary judgment be, and the same hereby is, DENIED.

25 DATED:  September 4, 2009

26

27 _____

                    WILLIAM B. SHUBB

28                   UNITED STATES DISTRICT JUDGE